Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Lead Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Wrap Technologies, Inc. Securities Exchange Act Litigation* | Case No: 2:20-cv-08760-DMG (PVCx) <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT** <br><br> Hon. Dolly M. Gee <br><br> Hearing Date: July 23, 2021 <br> Hearing Time: 9:30 AM <br> Courtroom: 8C |

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT..........................................................................1

II. STATEMENT OF FACTS ................................................................................3

   A.  Wrap is a Relatively New Company that Sells One Product: the BolaWrap .3

   B.  Amid Tepid Interest from Police Departments, Wrap Lands Trial with the LAPD for the BolaWrap ................................................................................4

   C.  Interim Results from the LAPD Pilot Program Show that the LAPD Barely Used the BolaWrap, and the Few Times that it was Used, the BolaWrap Largely Failed to Perform as Advertised .......................................................4

   D.  Defendants Mislead Investors about the LAPD Pilot Program .....................5

   E.  White Diamond Alerts Investors to the Details of the LAPD BolaWrap Report; Wrap Stock Price Plummets in Response ..........................................6

III. ARGUMENT ...................................................................................................6

   A.  Legal Standard................................................................................................6

   B.  The Complaint Adequately Pleads Loss Causation ........................................7

     1. The Adverse Information in the LAPD BolaWrap Report was not Absorbed by the Market until White Diamond Publicized it to Investors .......................8

      a.  The Average Investor had no Reason to be Aware of the LAPD BolaWrap Report until White Diamond's Disclosure .................................................9

     2. Short Seller Reports Can be Corrective Disclosures ...................................11

   C.  The Complaint Adequately Pleads Falsity.....................................................12

     1. Defendant Rothans' Statements are not Statements of Opinion...................12

     2. Even if they are Statements of Opinion, Rothans' Statements are Actionable ...........................................................................................................13

3.  Defendants Had a Duty to Correct Prior Misleading Statements .................15

D.  Defendants' False Statements were Material ...............................................15

E.  The Complaint Adequately Pleads Scienter ................................................17

F.  The Complaint Adequately Alleges Control Person Liability ......................19

**IV. CONCLUSION ................................................................................................20**

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................. 7

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................ 12, 17

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .............................................................................................. 7

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ............................................................................ 20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .............................................................................................. 8

*Hsu v. Puma Biotechnology, Inc.*,
213 F. Supp. 3d 1275 (C.D. Cal. 2016) ............................................................... 6

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ............................................................... 9

*In re Banc of California Sec. Litig.*,
No. SACV1700118AGDFMX, 2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) .... 11

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .......................................................................... 8, 10

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ......................................................................... 7, 8

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................ 12

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W.Va. 2012) .............................................................. 9

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
   2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ........................................................17

*In re Questcor Sec. Litig.*,
   No. SA CV 12-01623 DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ...11, 18

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012)...................................................................................7

*Maiman v. Talbott*,
   No. SACV090012AGANX, 2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) .......17

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ..................................................................................................15

*Mulligan v. Impax Lab'ys, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ....................................................................16

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003).................................................................................15

*Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC*,
   No. CV158574PSGMRWX, 2018 WL 6137169 (C.D. Cal. Aug. 29, 2018).......14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) .................................................................................12, 13, 14

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014)..................................................................................18

*Rudolph v. UTStarcom*,
   No. C 07-04578 SI, 2008 WL 4002855 (N.D. Cal. Aug. 21, 2008).........................7

*S.E.C. v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) ...............................................................................15

*S.E.C. v. Washington Inv. Network*,
   475 F.3d 392 (D.C. Cir. 2007) ................................................................................9

*Scott v. ZST Digital Networks, Inc.*,
   2012 WL 538279 (C.D. Cal. Feb. 4, 2021).............................................................10

iv

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ........................................................................................... 6, 17

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976) ................................................................................................ 15

## Statutes

15 U.S.C. § 78u-4(b)(1)(B)-(2)(A) ................................................................................. 7

15 U.S.C. § 78u-4(b)(2) ................................................................................................ 17

## Rules

Fed. R. Civ. P. 9(b) .................................................................................................... 7, 8

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 6, 7

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

Lead Plaintiff Timothy O'Hern ("Plaintiff") respectfully submits this memorandum of points and authorities in opposition to Defendants' Motion to Dismiss Amended Class Action Complaint (Dkt. No. 66).

## I.   PRELIMINARY STATEMENT

Defendant Wrap Technologies, Inc. ("Wrap" or the "Company") is a relatively new company that aims to develop and sell policing tools to law enforcement agencies. In 2017, Wrap began marketing the BolaWrap, a handheld device that discharges a lasso-like cord purportedly capable of wrapping a suspect from 10 to 25 feet away. To date, the BolaWrap remains Wrap's only product, and the Company's entire business depends on the success of the BolaWrap.

Police departments greeted the BolaWrap with tepid interest. In 2018 and 2019, Wrap failed to turn a profit – while suffering substantial losses – as the BolaWrap did not garner interest from large police departments. Wrap then intensified its marketing efforts, as it attempted to win contracts from large police departments through generous free trials. In December 2019, Wrap announced that the Los Angeles Police Department ("LAPD") had agreed to a pilot program to test the BolaWrap. Investors welcomed this news and Wrap's stock price immediately surged 17% in response. As part of the LAPD's pilot program, Wrap provided 200 BolaWraps to the LAPD and trained over 1,100 LAPD officers to use the BolaWrap.

In April 2020, as the LAPD's initial 90-day trial of the BolaWrap was coming to a close, Defendant Rothans – Wrap's Chief Technology Officer – told investment analysts that the LAPD pilot program was making "very good" progress, that the LAPD was using the BolaWrap "quite a bit," and the success rate of the BolaWrap during the trial was "really outstanding."

None of this was true. On September 23, 2020, the investment analyst White Diamond published a report on Seeking Alpha, an investor-focused website, alerting investors that the LAPD had actually released an interim report of its BolaWrap trial, and the results were disastrous. As the LAPD's interim report

showed, when Defendant Rothans made his statements about the LAPD trial, the LAPD had only used the BolaWrap eight times, and while the LAPD determined the BolaWrap to have been "effective" six of the eight times, the BolaWrap only managed to perform as advertised (*i.e.* actually wrap a suspect) one time. The LAPD deemed the five other "effective" deployments of the device as "effective" because the BolaWrap startled the suspect long enough for an officer to take the person into custody, and not because the BolaWrap managed to wrap the suspect, as it was designed and advertised to do. The remaining two deployments were completely ineffective. In other words, contrary to Rothans' statement that the LAPD was using the BolaWrap "quite a bit," the LAPD was in fact barely using the BolaWrap, and the few times when it did use it, the BolaWrap's performance was so poor that no reasonable person could have said its success rate was "really outstanding."

In their motion to dismiss, Defendants' primary argument concerns a technicality: that Plaintiff failed to plead loss causation because the market was already aware of the LAPD's interim report before White Diamond's publication. The Supreme Court, however, has held that market efficiency is not a binary proposition; rather, it is a matter of degree, and thus whether a piece of information is sufficiently "publicly available" is a complex issue that is typically not decided on a motion to dismiss. Indeed, case law abound holding that just because a piece of information exists in the public domain doesn't meant investors are aware of it, and just because investors *could* have accessed a piece of information doesn't mean they *did* access it. Here, while the LAPD's interim results may have existed in the public domain prior to White Diamond's disclosure, investors had no reason to be aware of it unless they were specifically searching for it. It was not until White Diamond publicized the LAPD's interim results to the investor community that the market learned the truth about the LAPD's BolaWrap trial, causing an immediate and substantial drop in the price of Wrap stock. Under relevant Supreme Court and

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

Ninth Circuit law, Plaintiff's complaint cannot be dismissed on the basis of loss causation.

Defendants' falsity argument fails because no reasonable person would have described the LAPD as using the BolaWrap "quite a bit" in its trial, or considered the success rate of the BolaWrap during the LAPD trial to be "really outstanding." Scienter is adequately pled because, among other things, Defendant Rothans himself admitted that he and the LAPD speak weekly about the BolaWrap trial, defeating any inference that he did not know the true progress of the LAPD trial or the performance of the BolaWrap. Lastly, there is no question that the progress of the LAPD BolaWrap trial – and the BolaWrap's performance in this trial – is material to Wrap's investors.

Defendants' motion to dismiss should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A. Wrap is a Relatively New Company that Sells One Product: the BolaWrap

Founded in 2016, Wrap describes itself as a "security technology" company that develops and sells policing tools to law enforcement agencies. ¶33.[1] In late 2017, Wrap began marketing the BolaWrap. ¶34. To date, the BolaWrap remains Wrap's only product, and accounts for nearly all of the Company's revenue. ¶4.

Wrap describes the BolaWrap as a "hand-held remote restraint device that discharges an 8-foot bola style Kevlar tether at 513 feet per second to wrap a subject's legs or arms at an effective range of 10-25 feet." ¶35. Wrap also posts numerous promotional videos on its website and on YouTube; these videos show BolaWrap rapidly discharging a cord that completely wraps around uncooperative subjects. *Id.*

---

[1] All citations to "¶_" refer to paragraphs of the Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") (Dkt. No. 65).

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

**B. Amid Tepid Interest from Police Departments, Wrap Lands Trial with the LAPD for the BolaWrap**

The law enforcement community's interest in the BolaWrap has been lukewarm. In 2019, Wrap generated less than $700,000 in revenue, resulting in net losses of more than $8.6 million. ¶37. A major reason for the BolaWrap's lack of commercial success has been Wrap's inability to secure orders from large police departments. ¶5. Indeed, Wrap has only been able to make inroads with small police departments, who typically purchase only a small number of BolaWraps. ¶37.

To increase the visibility of the BolaWrap and establish the device as a viable policing tool, Wrap understood that it needed to garner interest from larger police departments. ¶38. Thus, Wrap intensified its efforts to market the BolaWrap to large police departments through product demonstrations and free trials. *Id.*

Wrap's efforts appeared to pay off when, in December 2019, the LAPD agreed to start a trial program to evaluate the BolaWrap for possible purchase (the "LAPD Pilot Program"). ¶39. Investors welcomed this development: when Wrap announced the LAPD trial on December 3, 2019, Wrap's stock immediately surged by more than 17%. ¶40.

The LAPD Pilot Program officially began on February 5, 2020. ¶41. Originally intended to last 90 days, the trial was subsequently extended to 180 days. *Id.* As part of the LAPD Pilot Program, Wrap provided the LAPD with 200 BolaWraps, and trained approximately 1,100 LAPD officers to use the BolaWrap. ¶42.

**C. Interim Results from the LAPD Pilot Program Show that the LAPD Barely Used the BolaWrap, and the Few Times that it was Used, the BolaWrap Largely Failed to Perform as Advertised**

During the weekly meeting of the Los Angeles Board of Police Commissioners ("LAPD Commission") held on August 25, 2020, the LAPD sought authorization from the LAPD Commission to extend the LAPD Pilot Program for an additional 180-days due to insufficient sample size from the initial 180-day trial

4

period. ¶47. In connection with the extension request, the LAPD issued a report to the LAPD Commission detailing the LAPD's use of the BolaWrap from February 5, 2020 to August 10, 2020 (the "LAPD BolaWrap Report"). *Id.*

The LAPD BolaWrap Report showed that during the 180-day trial period, the LAPD only used the BolaWrap nine times. ¶48. Of the nine uses, the LAPD determined that the BolaWrap was "effective" in six of the uses, and "ineffective" in three. ¶55. Significantly, however, the LAPD BolaWrap Report revealed that only in one of the nine instances did the BolaWrap perform as advertised (*i.e.* wrap a suspect). *Id.* The other five "effective" deployment were classified as effective simply because the BolaWrap startled or confused the suspect long enough for the officer to take the person into custody – not because the BolaWrap managed to wrap the suspect. ¶61.

### D. Defendants Mislead Investors about the LAPD Pilot Program

On April 29, 2020, Wrap held a conference call with investment analysts to discuss its financial results for the first quarter of 2019 (the "Earnings Call"). ¶43. In response to an analyst's question about the progress of the LAPD Pilot Program, Defendant Rothans – Wrap's Chief Technology Officer who claims to have weekly communications with the LAPD about the Pilot Program – told the analyst:

> "[T]he progress has been very good. ***They've used it quite a bit. In fact, they've used it more than we anticipated*** they would be using it and the ***success rate has been really outstanding***."

¶44 (emphasis added).

Defendant Rothans made this statement despite the fact that as of April 29, 2020, the LAPD had used the BolaWrap only eight times, and determined it to be effective six times and ineffective twice; in other words, the LAPD was barely using the BolaWrap, and of the few times that it did use it, the LAPD found the BolaWrap ineffective 25% of the time. ¶11.

Following the release of the LAPD BolaWrap Report, Wrap participated in two investor conferences, and failed to either correct Defendant Rothans'

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

misrepresentation about the LAPD Pilot Program or update investors on the existence of the LAPD BolaWrap Report. ¶51. Instead, Defendant Smith – Wrap's President – touted to investors at the LD500 Virtual investor conference on September 3, 2020 that the LAPD has received great feedback from its officers about the BolaWrap. ¶52. He repeated the same statements at the 9th Annual Gateway Conference with investors on September 9, 2020. ¶53.

### E. White Diamond Alerts Investors to the Details of the LAPD BolaWrap Report; Wrap Stock Price Plummets in Response

On September 23, 2020, White Diamond Research published an article (the "White Diamond Report") on Seeking Alpha, a website for investors, detailing the LAPD BolaWrap Report and what it reveals about the BolaWrap. ¶14. The White Diamond Report highlighted the fact that the LAPD only used the BolaWrap nine times over a six-month trial period, a startling low usage rate given that the LAPD had 200 BolaWraps in its possession and over 1,100 officers trained to use it. ¶54.

Beyond pointing out that the LAPD deemed the BolaWrap effective in just six out of the nine times that it was used during the LAPD Pilot Program (for a failure rate of 33%), the White Diamond Report also reproduced a description of each use of the BolaWrap from the LAPD BolaWrap Report, clearly showing that only in one of the nine instances did the BolaWrap perform as advertised: wrap a suspect. ¶55.

Investors reacted swiftly to the White Diamond Report. Wrap's stock price declined by $2.07 per share, or over 25%, from its previous-day closing price to close at $6.07 per share on September 23, 2020, damaging Plaintiff and other Wrap investors. ¶56.

## III.   ARGUMENT

### A. Legal Standard

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must "consider the complaint in its entirety," "accept all factual allegations ... as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs,*

6

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1279 (C.D. Cal. 2016). A complaint "does not need detailed factual allegations," but need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact ... [S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for the later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Along with Rule 12(b)(6)'s requirements, a complaint alleging securities fraud must satisfy the requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to state with particularity the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading about the statements and why the statements were misleading when made. Fed. R. Civ. P. 9(b). Likewise, the PSLRA requires a plaintiff to specify the alleged false statements or omissions, identify the reasons why they are misleading, and state with particularity facts giving rise to a strong inference that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(1)(B)-(2)(A).

**B. The Complaint Adequately Pleads Loss Causation**

To plead loss causation, a plaintiff need only show "some indication of the loss and the causal connection that he has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). In the Ninth Circuit, "so long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *Gilead,* 536 F.3d at 1057; accordingly, "loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading

7

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

stage," *Rudolph v. UTStarcom*, No. C 07-04578 SI, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008).

While a plaintiff must comply with Rule 9(b) in pleading loss causation, the Ninth Circuit has held that "when applied to allegations of loss causation, however, Rule 9(b)'s particularly requirement usually adds little to the plaintiff's burden." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). Indeed, "even under Rule 9(b), the plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *Id.* (internal quotations omitted).

**1. The Adverse Information in the LAPD BolaWrap Report was not Absorbed by the Market until White Diamond Publicized it to Investors**

Defendants argue that because (1) the LAPD BolaWrap Report was publicly available, and (2) Plaintiff alleges that Wrap's stock trades in an efficient market, the White Diamond Report cannot be a corrective disclosure. In making this argument, Defendants erroneously reduce market efficiency into a binary proposition (*i.e.* a market for a stock is either efficient or inefficient, and thus it either fully absorbs all public information immediately or it does not absorb public information at all). However, the Supreme Court has expressly debunked Defendants' simplistic formulation, explaining that "[t]he markets for some securities are more efficient than the markets for others, and even a single market can process different kinds of information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 271 (2014).[2] In other words, just because certain piece of information exists in the public domain does not mean investors (and the market) were apprised of it

---

[2] *See also Gilead,* 536 F.3d at 1057–58 (rejecting "a bright-line rule requiring an immediate market reaction because the market is subject to distortions that prevent the ideal of a free and open public market from occurring").

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

immediately. As such, the issue of how the market absorbs publicly-available information and whether information is sufficiently "publicly available" is complex and not typically suitable for resolution on a motion to dismiss. *Id.* at 272. ("market efficiency is a matter of degree and accordingly...a matter of proof.").

### a. The Average Investor had no Reason to be Aware of the LAPD BolaWrap Report until White Diamond's Disclosure

To obtain a copy of the LAPD BolaWrap Report, one must find the LAPD Commission's website, then find the link to the agenda for the August 25, 2020 LAPD Commission meeting, and then scroll through the agenda to find the link to the LAPD BolaWrap Report. An investor would not know the report exists – much less where to find it – unless the investor was specifically looking for it and knew where to look. The average investor, however, had no reason to know that the BolaWrap would be on the agenda for the August 25, 2020 LAPD Commission meeting. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008) ("The mere fact that the agenda for the 2004 [Oncologic Drugs Advisory Committee] meeting was available to the public, or that the meeting itself was public, is not enough to shield Defendants from liability."); s*ee also, In re Massey Energy Co. Sec. Litig.,* 883 F. Supp. 2d 597, 618-19 (S.D. W.Va. 2012) (rejecting defendants' argument that investors were aware of alleged omitted information because it could be accessed on a government website).

Nor were the *Los Angeles Times* ("LA Times") and *Los Angeles Daily News* ("LA Daily News") articles sufficient to apprise Wrap investors of the negative information in the LAPD BolaWrap Report. First, both the LA Times and LA Daily News are regional periodicals, and neither are investor publications aimed at investors. Wrap investors are dispersed all over the country. The average person in New York, for example, cannot be reasonably expected to read and know what is in the LA Daily News. Moreover, both articles were short, one-page articles rather than main features that would appear on the front page of a newspaper or website.

9

*S.E.C. v. Washington Inv. Network*, 475 F.3d 392, 405 (D.C. Cir. 2007) ("The existence of the bar order may have been public information, but it was not information that was so widely disseminated that an average small investor could be expected to be aware of it."). Second, the LA Times article does not mention that the BolaWrap only successfully wrapped a suspect in one of the nine instances that it was used. *See* Ex. 8 to the Declaration of Kahlil C. Williams in Support of Defendants' Motion to Dismiss ("Williams Decl."). This was a key revelation in the White Diamond Report. Third, neither the LA Times or the LA Daily News article provided a link to the LAPD BolaWrap Report, or told readers where the LAPD BolaWrap Report could be found. Indeed, readers of the LA Times and LA Daily News articles would not even know that the LAPD BolaWrap Report was publicly accessible. Tellingly, the fact that White Diamond did not publish its report until September 23, 2020, almost a full month after the LA Times and LA Daily News articles, plausibly suggests that not even White Diamond – an *investment analyst* – was aware of the disclosures in the LA Times or LA Daily News, or else it would not have waited an entire month to publish its report in Seeking Alpha.

Unlike the LA Times or the LA Daily News, Seeking Alpha – where the White Diamond Report was published – is an investors' website that specifically targets investors. The investment community, and Wrap investors in particular, are much more likely to be aware of Wrap-related content posted on Seeking Alpha than buried in the LA Daily News. The immediate and precipitous drop in Wrap's stock price following the publication of the White Diamond Report supports the inference that the market was reacting to what it perceived to be new information. S*ee Scott v. ZST Digital Networks, Inc.*, 2012 WL 538279 (C.D. Cal. Feb. 4, 2021) (holding that the precipitous drop in ZST's stock price following the publication of the Second Short Seller report supports loss causation, even though Defendants argued that the information at issue were already disseminated six months earlier in the First Short Seller report.).

10

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

Indeed, while the LAPD BolaWrap Report may have existed in the public domain, it was not until White Diamond publicized it to the investor community that the market learned of the adverse information contained in it, causing an immediate and substantial drop in the price of Wrap stock. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (explaining that for pleading purposes, the plaintiff need only allege facts "plausibly suggesting" that market participants "had not done the same analysis" as the blogger who revealed the truth rather than that the market "could not" do the same analysis as the blogger.). Here, the relevant market participants – *i.e.* investors – had not done the same analysis of the LAPD BolaWrap Report until White Diamond did it on Seeking Alpha.

### 2. Short Seller Reports Can be Corrective Disclosures

Defendants also contend that the White Diamond Report is not a corrective disclosure because it is authored by a short seller, and a reasonable investor would have taken such publications "with a grain of salt." There is no rule that a short seller report cannot be a corrective disclosure. Numerous courts, including this one, have ruled that a short seller report may be a corrective disclosure. *See In re Questcor Sec. Litig..*, No. SA CV 12-01623 DMG, 2013 WL 5486762, at *21 (C.D. Cal. Oct. 1, 2013) (Gee, J.) (holding that the plaintiffs adequately pled loss causation where the corrective disclosure is a short seller report). Moreover, the precipitous drop in Wrap's stock price following its publication showed that investors did not take the White Diamond Report "with a grain of salt." Indeed, Defendants have offered no other explanation for the sharp decline in Wrap's stock price on September 23, 2020. *Id.* ("Defendants do not offer any other explanations for these declines in prices. Accordingly, the Court concludes that Plaintiffs have adequately pleaded loss causation.").

Defendants also assert that the White Diamond Report merely offered an analyst's negative opinion, and is thus nothing more than a "black swan event." But neither Plaintiff's Complaint or the White Diamond Report is based on White

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

Diamond's *opinion* that the LAPD Pilot Program was disastrous; rather, they are based on the *facts* that led to White Diamond's ultimate opinion of the failure of the LAPD Pilot Program: specifically, that the LAPD barely used the BolaWrap during the 6-month trial, and that only once during the entire LAPD Pilot Program did the BolaWrap manage to actually wrap a suspect. *In re Banc of California Sec. Litig.*, No. SACV1700118AGDFMX, 2017 WL 3972456, at \*10 (C.D. Cal. Sept. 6, 2017) (distinguishing between reacting to an analyst's negative opinion and the facts that led to the negative opinion).

## C. The Complaint Adequately Pleads Falsity

"A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "Only if reasonable minds could not disagree … should the district court dismiss under 12(b)(6)." *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1021-22 (S.D. Cal. 2005).

### 1. Defendant Rothans' Statements are not Statements of Opinion

Defendant Rothans' statements during the Earnings Call about the LAPD Pilot Program were misleading statements of fact. No reasonable person could have said that the LAPD was using the BolaWrap "quite a bit," or that the success rate was "really outstanding." ¶46.

Defendants attempt to exculpate themselves by branding these statements as mere opinions. They are not. Not only did Rothans make no attempt to indicate that he was simply expressing his opinion (*e.g.* by prefacing his remarks with "I think," "I believe," or "in my opinion"), he instead expressly couched them as facts:

> "[T]he progress has been very good. They've used it quite a bit. ***In fact***, they've used it more than we anticipated they would be using it and the success rate has been really outstanding."

¶46 (emphasis added).

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

Indeed, they are statements of facts not just because Rothans said they were; the average person would have construed statements that the LAPD was using the BolaWrap "quite a bit" and that the success rate was "really outstanding" as statements of fact. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015), the Supreme Court used the statement "the coffee is hot" as an example of a statement of fact. This is a statement of fact even though different people might have different thresholds for what constitutes "hot" coffee. The statement "the coffee is hot" is very similar to Rothans' statement that "the success rate has been really outstanding."

According to *Omnicare,* the key distinction between a statement of fact and an opinion is that the latter conveys a lack of certainty about the statement's content. *Id.* at 187-88 ("a statement of opinion implies that the speaker is not certain enough of what he says…without the qualifying language") (internal citations and quotations omitted). No reasonable person hearing Rothans' statements would think that he was uncertain about what he was saying, or that he was attempting to convey uncertainty. As the Supreme Court points out, the difference between a statement of fact and opinion is "so ingrained in our everyday ways of speaking" that there should not be a need to perform mental gymnastics to determine whether a statement is a fact or opinion. *Id.* at 183.

Here, because the LAPD had only used the BolaWrap eight times as of the Earnings Call, and because the BolaWrap was ineffective 25% of the time that it was used (and even worse, only in one instance did it actually wrap a suspect), Rothans' statements that the LAPD was using the BolaWrap "quite a bit" with a "really outstanding" success rate are false and misleading.

**2. Even if they are Statements of Opinion, Rothans' Statements are Actionable**

Even if, *arguendo*, Rothans' statements are opinions (and they are not), they are still actionable under *Omnicare*. The Supreme Court explained that a reasonable

13

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Id.* at 188-89. Liability therefore attaches when an issuer "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.*

To illustrate, the *Ominicare* court explained that if a CEO said "we believe our conduct is lawful," an investor would expect that this statement was based on some meaningful legal inquiry, even though it is clearly an opinion. *Id.* at 188-89. Thus, if it turns out that the CEO made no inquiries, or that the inquiries actually revealed contradictory information, then the CEO's statement of opinion is actionable. *Id.*

Here, while Rothans did not explicitly state the basis for his assertion that the LAPD was using the BolaWrap "quite a bit" and that the success rate was "really outstanding," the reasonable person would infer that the bases for Rothans' statements were his communications with the LAPD about its BolaWrap pilot program.[3] Unless the LAPD lied to Rothans about how many times it was using the BolaWrap and its effectiveness (and there is no reason to believe that it did), the information that Rothans received from the LAPD would not have led a reasonable person to say that the LAPD Pilot Program was making "very good" progress, that the LAPD was using the BolaWrap "quite a bit," or that the success rate of the BolaWrap in the LAPD Pilot Program was "really outstanding."   As such, even if Rothans' statements are opinions (and they are not), they are still actionable.

---

[3] Rothans would later confirm that he's in "constant communication with the LAPD" and speaks with the LAPD "on a weekly basis" about the BolaWrap. ¶65.

14

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

### 3.  Defendants Had a Duty to Correct Prior Misleading Statements

Even if Rothans did somehow (irrationally) believe, on April 29, 2020, that the LAPD was using the BolaWrap "quite a bit" with a success rate that's "really outstanding," the LAPD BolaWrap Report would have alerted him otherwise. Courts in this circuit, along with the First, Second, Third, Seventh, and Eleventh Circuits have recognized that the securities laws "impose a duty upon one who falsely states a historical fact that he or she believed to be true at the time to correct the statement within a reasonable time after learning the true facts." *Oaktree Principal Fund V, L.P. v. Warburg Pincus LLC*, No. CV158574PSGMRWX, 2018 WL 6137169, at *11 (C.D. Cal. Aug. 29, 2018).

Wrap participated in two investor conferences following the release of the LAPD BolaWrap Report. ¶¶51-53. During the two investor conferences, Defendants continued to tout the LAPD Pilot Program, claiming that the LAPD received "great feedback" from its officers about the BolaWrap. *Id.* Defendants did not correct Rothans' earlier misleading statements, nor did Defendants even mention that the LAPD had issued a report with results from its BolaWrap pilot program (much less that the results were highly negative).

## D. Defendants' False Statements were Material

The fact-intensive question of materiality in the context of a §10(b) action comes down to "whether a *reasonable* investor would have viewed the nondisclosed information "as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (emphasis in original). There is no "bright-line rule" as to whether a false statement or omission is material (*id.* at 30), and only if "'reasonable minds cannot differ on the question of materiality'" should a court find that, as a matter of law, a misstatement or omission is immaterial. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Similarly, the decision as to "'whether adverse facts were

15

adequately disclosed is a mixed question to be decided by the trier of fact.'" *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

Here, the LAPD Pilot Program was critical to Wrap; a successful LAPD Pilot Program means not only a potentially lucrative order from a large and prestigious police department, but also gives the BolaWrap credibility as a viable policing tool, providing a tremendous boost to Wrap's marketing efforts. That Wrap's stock price surged by over 17% when Wrap announced the LAPD Pilot Program shows its importance to investors. ¶40. *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) ("the fact that a firm's stock price does significantly change is strong evidence of materiality"). As such, one could hardly dispute that it was material for investors to know about the progress of the LAPD Pilot Program, and what the LAPD Pilot Program showed about the actual performance of the BolaWrap.

Defendants' contention that the statements at issue were "contextualized" during the Earnings Call by remarks about the overall slowdown of sales and policing activities due to COVID is unavailing. Defendants assert that Rothans' statements about the LAPD using the BolaWrap "quite a bit" doesn't mean that the LAPD was *objectively* using it frequently; rather, it means that the LAPD was using it "quite a bit" *in light of* COVID. But an equally plausible inference is that the LAPD was using the BolaWrap "quite a bit" *despite* COVID. Moreover, even if investors construed Rothans' remarks as the LAPD using the BolaWrap "quite a bit" in light of COVID, Rothans' statements nevertheless promoted the false impression that the LAPD was using it frequently, such that even if a purchasing decision cannot be made at the conclusion of the initial 90-day trial period, a single 90-day extension might be sufficient for the LAPD. A reasonable investor could not have fathomed from Rothans' statements that the LAPD Pilot Program would be languishing in trial – without a final decision – for more than a year longer with no decision in sight.

16

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

Nor are the false statements immaterial puffery. Courts dismiss statements as inactionable puffery only if the statements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014). After hearing Rothans stating that the success rate of the BolaWrap during the LAPD Pilot Program was "really outstanding," a reasonable investor would be far more likely to invest in Wrap, because Rothans' statement means that BolaWrap performed as advertised, and so it was far more likely that (1) the LAPD would purchase the BolaWrap, and (2) the BolaWrap becomes known as a viable policing tool. Rothans' statement was a far cry from the truth – in only one of the nine instances that the LAPD deployed the BolaWrap did it actually wrap a suspect.

That the White Diamond Report detailing the negative results from the LAPD Pilot Program caused a 25% drop in Wrap's stock price shows that the truth about the LAPD Pilot Program was material. *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *7 (N.D. Cal. Apr. 21, 2016) ("Because the corrective disclosure that highlighted the omission is alleged to have caused a 25.9% stock decline in Montage stock price, the omission is material, as reasonable investors would have considered the omission important in determining whether to purchase shares of Montage stock.").

**E. The Complaint Adequately Pleads Scienter**

To adequately allege scienter, "Plaintiffs must 'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987 (quoting 15 U.S.C. § 78u-4(b)(2)). In *Tellabs*, the Supreme Court held that scienter is adequately pled where the inference of fraud is cogent and at least *equally* as likely as any non-culpable explanation of the alleged conduct. 551 U.S. at 314. The appropriate inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual

17

allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. "[A] tie goes to the Plaintiff." *Maiman v. Talbott*, No. SACV090012AGANX, 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010).

Here, Defendants knew the true progress of the LAPD Pilot Program and the true performance of the BolaWrap when Rothans made his misleading statements during the Earning Call; Defendant Smith bragged on a video posted to Wrap's YouTube channel on September 24, 2020 that Rothans was in "constant communication with the LAPD" throughout the entire LAPD Pilot Program. ¶65. Rothans himself then confirmed in the same video that he had indeed been speaking with the LAPD on a weekly basis about the BolaWrap for "the last two years." *Id.* Unless the LAPD was lying to Rothans about the LAPD Pilot Program and about the actual performance of the BolaWrap during their weekly communications, Rothans knew as of the Earnings Call that the LAPD was barely using the BolaWrap and that the BolaWrap only fully wrapped a suspect once (and still failed at a 25% rate even if instances in which the BolaWrap merely startled the suspect, allowing for apprehension, are deemed "effective"). The LAPD had no motive to lie to Rothans or exaggerate the results from the Pilot Program in any way. The inference that the LAPD told Rothans the truth during their weekly communications is as plausible, if not more so, than the competing inference that the LAPD lied to Rothans and falsely hyped the BolaWrap for no apparent reason.

Additionally, BolaWrap is Wrap's only product. Its entire business depends on the BolaWrap. The Ninth Circuit permits an inference of scienter where, as here, the alleged fraud concerns a business's core operations. *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014). The LAPD Pilot Program is integral to BolaWrap's (and in turn, Wrap's) future prospects; Rothans made sure to keep himself fully apprised of the progress of the LAPD Pilot Program through weekly communications with

18

the LAPD. This supports an inference of scienter. *In re Questcor,* 2013 WL 5486762, at *19 (Gee, J.) (applying the core operations theory to hold that "The Individual Defendants' active involvement in and public statements regarding [Questcor's primary product]'s success suggest that they were aware of the shortcomings of the research and marketing strategies but misled the public in order to advance Questcor's sales efforts.").

In any event, after the disastrous LAPD BolaWrap Report was issued on August 25, 2020, Defendants certainly knew about the contents of the report. Nevertheless, Defendants kept silent about it during the investor conferences in the weeks after and did not bother to correct Rothans' prior misleading statements, instead choosing to tell investors that the LAPD was getting "great feedback" from its officers about the BolaWrap.

Defendants are wrong that Defendants had no motive to falsely portray the LAPD Pilot Program in a positive light. For a relatively new company with meager sales and tepid interest in its only product, to be able to say that one of the world's largest and most sophisticated police departments is testing the BolaWrap is a major boon to Wrap's credibility and marketing efforts. So long as no negative reports come out of the LAPD about the BolaWrap, Wrap could continue marketing the BolaWrap as a product that even the LAPD was seeking to purchase, thereby maintaining investor confidence as well as garnering customer interest. If, however, the market found out that the LAPD Pilot Program was going poorly and the BolaWrap was a flop, Wrap would not only have a harder time attracting new customers, but investors would also be scared off. That's exactly what happened after White Diamond alerted investors to the LAPD BolaWrap Report, with Wrap's stock price plunging as a result.

**F. The Complaint Adequately Alleges Control Person Liability**

Defendants' only argument against Plaintiff's Section 20 control-person claim is that the Complaint fails to plead a primary violation of Section 10(b).

19

Memorandum of Law in Opposition to Defendants' Motion to Dismiss

Accordingly, if the Court finds that the Complaint adequately states a claim under Section 10(b), then Plaintiff's control-person claim is properly pled.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. If the Court grants Defendants' motion, Plaintiff respectfully requests leave to amend. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Dated: June 11, 2021                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi (*pro hac vice*)
275 Madison Ave, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Lead Plaintiff*

20

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2021, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence M. Rosen
Laurence M. Rosen

21